**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **KARINA BERNAL,** | § | |
| | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | **CAUSE OF ACTION NO.** |
| | § | **1:24-cv-1471** |
| **UBER TECHNOLOGIES, INC., a** | § | |
| **Delaware Company; RASIER, LLC, a** | § | |
| **Delaware Limited Liability Company;** | § | |
| **and MALIK DOE,** | § | |
| | § | |
| *Defendants* | § | |
| | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

COMES NOW, Plaintiff Karina Bernal, by and through the undersigned counsel, and hereby files this Complaint and alleges as follows:

### I.    NATURE OF ACTION

1.    This is a civil rights and personal injury action involving the lack of disabled access to the services provided by Defendant Uber Technologies, Inc. ("Uber"), a company that provides rideshare services around the world, including the entire United States and in Texas, and injuries negligently inflicted by Uber's driver, Malik Doe, when he denied access to a visually impaired person.

2.    Plaintiff Karina Bernal ("Plaintiff" or "Ms. Bernal") is visually impaired and uses a guide dog. Because she cannot drive, Plaintiff must rely on public transportation, taxis, and rideshare services such as those provided by Uber.

3.    Under Title III of the Americans with Disabilities Act of 1990 ("ADA") and the Texas Human Resources Code ("THRC"), refusal to serve blind or visually impaired persons on the basis of their service dogs is actionable discrimination. Uber, together with its subsidiary,

1

Defendant Rasier, LLC, (together "Uber" or "Defendants") are covered entities under the ADA and THRC because they are private businesses primarily engaged in the transportation of people, whose business affects commerce.

4.      Since the filing of *National Federation of the Blind v. Uber Technologies, Inc.*, N.D Cal. Case No. 3:14-cv-4086 (NC) ("*NFB* case") in 2014, Uber has been aware of the systemic discrimination inherent in its platform—that Uber's drivers consistently deny rides to disabled riders who travel with service dogs, despite the ADA and Uber's own service dog policy, which also prohibits discrimination on the basis of traveling with a service dog. In over a decade since the *NFB* case, and despite countless additional cases filed against Uber in court and in arbitration and an ongoing investigation by the U.S. Department of Justice ("DOJ") because of discrimination against people traveling with service dogs, Uber drivers continue to deny rides to disabled riders who are traveling with service dogs and many times have resorted to unsafe actions to prevent service dogs from entering their vehicles. Uber's response to this continued discrimination has been inadequate and, in many cases, plainly dismissive.

5.      Uber engaged—and continues to engage—in prohibited discriminatory practices by failing to properly train its drivers and permitting them to deny access to visually impaired riders like Ms. Bernal when they are with their guide dogs. Uber has failed to make reasonable modifications in its policies, practices, or procedures to avoid continued discrimination against blind or visually impaired riders like Ms. Bernal. Uber is also liable for Uber drivers because 1) Uber has a nondelegable duty to comply with the ADA, and 2) Uber drivers are Uber's agents and employees. Uber is thus both directly and vicariously liable for violating the ADA when Malik Doe denied Ms. Bernal's access to a ride because of her guide dog.

6.      At all times relevant herein and continuing, Ms. Bernal was denied equal protection of the law and was denied civil rights under state and federal law. Uber's discriminatory policies and continued failure to accommodate blind or visually impaired riders with guide dogs deny full and equal access to individuals with visual disabilities, including Ms. Bernal, in violation of the

ADA and the THRC. Uber and Defendant Doe are also liable for several tort claims under Texas law for the personal injuries caused to Plaintiff.

7.    As set forth more fully below, Plaintiff was seriously injured by Defendant Malik Doe because Doe negligently accelerated to drive away from Plaintiff when he saw she was traveling with a guide dog, despite seeing that Plaintiff was in the process of getting in the vehicle with her service dog.  Doe failed to ensure it was safe to drive away when he did, and when he accelerated Plaintiff could not get her hand out of the door handle before he drove off. As a result, Doe dragged Plaintiff into the street, causing her serious injuries.

8.    The Uber ride at issue was ordered by Plaintiff through the rideshare software application owned and controlled by Uber.

9.    Defendant Uber negligently hired, supervised, and trained Defendant Doe.

10.    Defendant Malik Doe, while in the course and scope of his employment for Uber and while otherwise working on behalf of Uber negligently injured Plaintiff as set forth below.

11.    Plaintiff brings this civil rights and personal injury action against Uber and Malik Doe to seek injunctive and declaratory relief, and to recover damages for the injuries she suffered as a result of Malik Doe's dragging her into the street to avoid serving Plaintiff with her guide dog and for Uber's actions and omissions which support systemic discrimination against disabled individuals traveling with service dogs.

## II.    JURISDICTION AND VENUE

12.    This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343 for Plaintiff's claims arising under federal law, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for Plaintiff's claims arising under state law.

13.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b). The events giving rise to Plaintiff's claim occurred in this district and Defendant Uber operates in this district.

### III.    **PARTIES**

14.    Plaintiff is over the age of 18 and is a resident of Rowlett, Dallas County, Texas. She is a "person with a disability" or "physically handicapped person." Plaintiff is visually impaired in her left eye. She often requires the use of her specially trained and qualified service dog to accompany and assist her when she travels outside of her home.

15.    Defendant Uber Technologies, Inc. is a for-profit transportation company licensed to do business in Texas. It is incorporated in Delaware and headquartered in San Francisco, California. With its subsidiary Defendant Rasier, LLC, Uber's primary business is the promotion and provision of transportation services. Uber uses its mobile phone software application to arrange rides between passengers and its fleet of drivers in much the same way that a taxi dispatch arranges rides for customers. Defendant Uber Technologies, Inc. can be served through its registered agent CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, Texas 75201-3136. *Service is hereby requested at this time.*

16.    Defendant Rasier, LLC is a corporation licensed to operate in Texas. It is a Delaware limited liability company; is a wholly-owned subsidiary of Defendant Uber Technologies, Inc.; and maintains its corporate headquarters, principal office, and principal place of business in San Francisco, California. Upon information and belief, Defendant Rasier, LLC is a required party pursuant to Federal Rule of Civil Procedure 19(a)(1) because in its absence, the court cannot accord complete relief from Uber Technologies, Inc. alone. Defendant Rasier, LLC can be served through its registered agent CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, Texas 75201-3136. *Service is hereby requested at this time.*

17.    Defendant Malik Doe is an individual who, through the course and scope of his employment by the Uber Defendants, operated a rideshare vehicle in Austin, Travis County, Texas during all relevant times. Plaintiff does not know, and Uber will not disclose, Doe's full name and address; however, Plaintiff's Uber history shows his first name to be Malik.

18.    Plaintiff is informed and believes, and on that basis alleges, that at all relevant times, Defendant Rasier, LLC was acting as Uber Technologies, Inc.'s agent.

4

19.     Plaintiff is informed and believes, and on that basis alleges, that at all relevant times, Defendant Malik Doe was a resident of Austin, Travis County, Texas and was acting as Uber's agent, servant, and employee.

20.     Plaintiff is informed and believes, and on that basis alleges, that at all relevant times, each Defendant was the agent, servant, licensee, employee, assistant, consultant, or alter ego, of each other Defendant, and was at all relevant times acting within the course and scope of said relationship when Plaintiff was injured.

21.     Plaintiff is informed and believes that each Defendant, when acting as a principal, was negligent in the selection, hiring, supervision, or retention of each other Defendant as an agent, servant, employee, assistant, or consultant.

22.     Plaintiff is further informed and believes, that at all relevant times, each Defendant, through its officers, directors, supervisors and managing agents, and each individual Defendant, had advance knowledge of the wrongful conduct and behavior propensity (related to the denial of service dogs) of said agents, servants, licensees, employees, assistants, consultants, and alter egos, and allowed said wrongful conduct to occur and continue to occur, thus ratifying said wrongful conduct, and, after becoming aware of their wrongful conduct, each Defendant by and through its officers, directors, supervisors, and managing agents, and each Defendant, authorized and ratified the wrongful conduct that injured Plaintiff.

23.     Defendants are liable for the acts of each other through principles of *respondeat superior*, agency, ostensible agency, partnership, alter-ego, and other forms of vicarious liability.

## IV.    <u>FACTUAL STATEMENT</u>

### A.  UBER'S OPERATIONS

24.     Uber operates a rideshare application that allows users to request transportation and then connects them with a vehicle and a driver. Uber operates in scores of metropolitan cities across the U.S. and the world.

25.     Uber's services are available to people who download the application on their smartphones and open an account with a credit card. To use Uber, an individual must either (1)

COMPLAINT

create a user account, and provide Uber with his phone number, credit card information, and email address; or (2) travel as the guest of an individual with an Uber user account.

26.    The customer then submits a ride request on behalf of herself through Uber's mobile software application. Uber provides an application for riders (the riderside app) and a separate application for drivers (the driver-side app). Because these twin applications are meant to and do interact with one another, providing a means of allowing Uber to control all substantive and financial interactions between Uber riders and drivers, the dual applications are referred to herein interchangeably as the "Uber App" or the "App".

27.    Once Uber identifies the vehicle that will provide the customer with transportation, Uber notifies the customer via text message or through the App. The notification includes vehicle identification information and the driver's first name and picture as well as an estimated time of arrival. On the driver-side, Uber notifies the driver of the location of the rider and their first name (or a name chosen by the rider). When the vehicle has arrived at the rider's location, Uber notifies the customer, and the customer and any additional passengers may board the vehicle. Additionally, up until the moment that the rider enters the vehicle, she may communicate with her assigned driver via text messages sent directly through the Uber App.

## B.  UBER IS PRIMARILY ENGAGED IN TRANSPORTATION

28.    While recently Uber has also become engaged in some other types of ventures, the vast majority of its investment, profits, and promotional activities are occupied by its ridesharing, *i.e.*, transportation, services.

29.    Uber's twin consumer-facing ridesharing applications are not the only technology it has developed to optimize its transportation network. It also uses proprietary programs and algorithms to match supply and demand, such as predicting where and when peak rider volume will occur, optimizing match-pairs between drivers and riders, and setting dynamic ride pricing. In addition, Uber has created routing and payments technologies that provide the seamless service its riders and drivers have come to rely upon. All of these projects represent substantial investment in Uber's network for the offer and procurement of personal transportation.

6

30.    Uber provides "specified public transportation services," as that term is defined by 42 U.S.C. § 12184(a), via the drivers that Uber pays for providing rides to Uber riders ("Uber Driver" or "Uber Drivers").

31.    Uber is a "common carrier" and/or "public conveyance or mode of transportation" operating within the State of Texas as that term is used in THC 121.003(b).

## C.  UBER'S OPERATIONS AFFECT COMMERCE

32.    Uber's transportation services have a demonstrable and substantial effect on commerce. Uber's 2023 revenues for rideshare services were more than $19.8 billion. In addition to Uber's own revenues, Uber drivers have earned many billions of dollars in service fees and tips through the Uber App.

33.    Uber has claimed in public filings that it has a leading ridesharing category position in every major region of the world where it operates, which includes approximately 70 countries.

## D.  UBER CONTROLS THE DRIVERS AND THEIR WORK

34.    Uber Drivers in general, including Defendant Doe who discriminated against Plaintiff and negligently injured her, have zero control over the value of their services. Uber unilaterally sets the base fare, time fare, distance fare, wait-time fare, and all surge fares. Uber directly set all prices.

35.    Uber had exclusive access to the customer list (riders), customer locations, and the customer's destination requests.

36.    Uber assigned all Uber Drivers' work through driver/rider matching. Uber Drivers cannot choose which rider to be matched with. Likewise, Uber riders like Plaintiff have no ability to prevent being paired with an Uber Driver who Uber knows has previous history of denying rides to Uber riders traveling with service dogs or otherwise has exhibited unsafe or dangerous driving behavior toward riders.

37.    Uber had exclusive control of the customer volume. Uber decided who, when, where, and how many ride requests to assign to an Uber Driver.

7

38.     To begin work, Uber Drivers log into the driver app ("Driver App") and then wait for Uber to select a customer who required Uber's services. Uber refers to this time that Uber Drivers are activated but un-dispatched as "Period 1" time (or "P1").

39.     Uber uses real-time GPS monitoring to track Uber Drivers at all times while logged into the App, beginning with P1 time. Additionally, Uber's patented technology allows Uber to monitor audio within the vehicle on a drive, the driver's speed, whether the driver is arriving within Uber's estimated time of arrival, whether the driver is taking the rider "off route," and (amongst other things) whether the driver is operating his vehicle in an expected and acceptable way to Uber.

40.     During P1, Uber unilaterally decides when and where to send the Uber Driver trip assignments for customers requesting rides.

41.     Once Uber offers an Uber Driver a trip assignment, Uber only allows the driver 15 seconds decide whether to accept the assignment. Uber controls the information provided to the driver during the 15 seconds and does not provide the driver estimated fare, estimated distance, estimated time, rider's pickup location, or final destination, even though it possesses all that information.

42.     If Uber Drivers fail to accept three trips in a row, Uber automatically kicks them off its system.

43.     Once an Uber Driver acceps a trip assignment, the driver enters what Uber refers to as "Period 2" time ("P2"). This is the period in which the Uber Driver is dispatched but has not picked up the rider.

44.     During P2, Uber provides the Uber Driver with the rider's pickup location, but it still does not provide the Uber Driver with the estimated fare or estimated trip time, distance, or destination.

45.     Upon arriving at the rider's location, the Uber Driver remains in P2 until the rider physically enters the vehicle. Once the rider enters, the Uber Driver must inform the Driver App to begin the trip. The time during which the Uber Driver is transporting the rider to his or her destination is referred to as "Period 3" ("P3").

46.    Uber decides the amount of payment for the fare incurred during P3. Uber exclusively sets the fare price and the Driver App provides no function that would allow the Uber Driver to adjust the fare.

47.    Uber monitors the Uber Driver use of the App, the rate of accepted assignments, and the rate at which he cancels assignments, which Uber can use to deactivate or suspend the Uber Driver.

48.    Uber exclusively maintained the right to deactivate or suspend Uber Drivers from the Driver App based on Uber's policies. Uber could therefore unilaterally terminate Uber Drivers without notice or explanation.

49.    The Uber Driver is tracked by Uber at all times while logged on the App.

50.    The Uber Driver is tracked at all times (while logged on), including the Uber Driver's location, routes, speed, and acceleration. If the Uber Driver deviates from Uber's suggested route, Uber notifies the Uber Driver that he is not following the suggested route.

51.    On information and belief, despite the ability to do so, Uber does not adequately monitor its Uber Drivers for driving safety or observance of traffic laws or provide any training, driving test, safety course, or other check for safe driving by its Uber Drivers.

52.    Uber processes all payments and distribution of payments to the Uber Driver.

53.    The Uber Driver's work is integral to Uber's business, as Uber cannot provide transportation services without drivers.

54.    Uber's is constantly monitoring Uber Drivers behind the scenes according to its policies and using its technology. Uber maintains policies that analyze multiple safety categories including claims of discrimination, misconduct, physical altercations, verbal altercations, inappropriate rider contact, potential safety concerns, dangerous driving, and sexual assaults.

55.    Uber is aware when their Uber Drivers are acting inappropriately and are acting in a way that creates a potential safety concern.

56.    If an Uber Driver violates a safety category or discriminates against a rider with a disability because of the rider's disability, Uber issues "strikes" to drivers, which amount to

9

negative employment actions, that can result in the driver being permanently removed from the Uber Driver App if too many strikes are issued.

57.     However, Uber does not inform the driver or riders if they have issued prior strikes to the Uber Driver. On information and belief, Uber Drivers receive no information from Uber concerning any safety or discrimination strikes until their driving crosses Uber's unknown threshold of strikes for termination.

58.     On information and belief, an Uber Driver's intentional refusal to serve a person with a disability like Plaintiff does not result in enough "strikes" to terminate the Driver from Uber's employment.

59.     On information and belief, an Uber Driver's negligent driving that injures a rider like Plaintiff or exposes them to serious injury does not result in enough "strikes" to terminate the Driver from Uber's employment.

60.     As a result, Uber allows Uber Drivers it knows are unsafe drivers or who discriminate against people with disabilities to continue driving for Uber without any correction, training, or re-training.

61.     Uber's service dog policy states: "State and federal law generally prohibit transportation providers from denying service to riders because of their service animals, and from otherwise discriminating against riders with service animals. For this reason, and because it's the right thing to do, Uber's policy also prohibits drivers who use the Uber Driver App from denying service to a rider because of the rider's service animal. There are no exceptions to this policy due to allergies, religious objections, or a generalized fear of animals. As explained in Uber's Community Guidelines, drivers who engage in discriminatory conduct in violation of Uber's policy may lose their ability to use the Driver App. Uber will make this determination in its sole discretion following a review of the incident."

62.     Upon information and belief, despite this written policy, Uber took no steps to train its Uber Drivers, including Malik Doe, on his obligations under the ADA and the THRC to not

discriminate against visually impaired Uber riders like Plaintiff because of the presence of her service dog.

63.    Upon information and belief, despite this written policy, Uber continued and continues to allow Uber Drivers who violate this policy to operate as Uber Drivers.

### E. DEFENDANT MALIK DOE INTENTIONALLY DISCRIMINATED AGAINST PLAINTIFF BERNAL AND, IN THE PROCESS, NEGLIGENTLY INJURED HER.

64.    On December 5, 2022, Plaintiff requested a ride through her Uber App to give her and her service dog, Papita, a ride.

65.    When Defendant Doe was matched with Plaintiff as her Uber driver and arrived at the pickup location,[1] Plaintiff approached and opened the door of Doe's dark-colored four-door sedan. Doe, speaking to Plaintiff through the open passenger side window of his car, immediately took issue with Papita. Doe shouted "No dogs! No dogs!"

66.    Plaintiff told Doe as she was opening the back passenger door of Doe's car that Papita was a service dog and that she is allowed to ride with her. Plaintiff advised Doe that it was against the law to refuse her a ride because of her service dog.

67.    Despite the fact that Plaintiff was still holding onto the door of the car, Doe attempted to drive away and accelerated when it was unsafe to do so, because Plaintiff was still holding onto the handle of his door.

68.    Plaintiff could not get her hand out of the car handle before Doe drove off. Doe's acceleration thus dragged Plaintiff forward, severely injuring her.

69.    Plaintiff sustained severe and painful injuries to her left index, middle, and ring, fingers; her left wrist; forearm; elbow; upper arm; and shoulder. Her left hand is her dominant hand and the hand she uses to stabilize herself with her cane and to use her service dog. Plaintiff is also diabetic, and at the time of the incident, she had a wound on the bottom of her foot that was healing between the arch of her foot and her heel. The momentum of the Doe's car pulling Plaintiff into the street caused her shoe to come off partially, which took off the scab of the healing wound,

---

[1] Plaintiff's Uber App identified Defendant Doe as "Malik."

reopened the wound, and caused another wound near where her toe is amputated near the ball of the same foot, causing Plaintiff significant pain.

70.    Doe seriously injured Plaintiff and put her service dog at risk of physical injury. Plaintiff's hand and arm injuries caused by this incident have rendered her unable to use her cane or walk with her service dog without pain and difficulty, and sometimes she is in so much pain she cannot use her left hand and arm at all. As a result, Plaintiff has fallen trying to ambulate without proper use of her left hand, which has caused additional injuries to her knees, hips, back, palms of her hands, legs, and feet.

71.    The cast that doctors put on her injured foot because of the accident caused another wound near her ankle where the cast rubbed against her skin. This cast needed to be removed because of the wound, causing additional pain and suffering.

72.    In addition to Plaintiff's numerous physical injuries, the incident and the resulting loss of mobility have triggered Plaintiff's anxiety, increased her symptoms of Post Traumatic Stress Disorder ("PTSD") and depression, prompted recurring nightmares of the horrible experience, and caused severe mental anguish.

73.    Plaintiff reported the incident to Uber shortly after it occurred and followed up with "Uber Support" several times to check on the status of her claim. Uber representatives advised Plaintiff that Uber would conduct an internal investigation and get back to her, but no one followed up. Plaintiff called Uber Support again after about thirty days and inquired why the investigation was taking so long without anyone contacting her. The Uber representative Plaintiff spoke with told Plaintiff that the complaint had not been properly logged the first time, so Uber had not commenced an investigation and would need to re-log the complaint.

74.    After Plaintiff again reported the incident to Uber, she learned that Uber deemed the incident insufficiently serious to merit any follow up or submission to its insurance carrier. No one called to talk to Plaintiff before Uber came to this decision.

75.    On information and belief, Uber did not assign any strikes or sufficient strikes to Defendant Malik Doe for his intentional discrimination and negligent driving to terminate him.

12

COMPLAINT

Uber also did not provide or require any training or retraining to Defendant Doe but continued to allow him to operate as an Uber Driver.

## V.    CAUSES OF ACTION

### A.    VIOLATION OF TITLE III OF THE ADA
**[42 U.S.C. §§ 12101, *et seq*.]**
**(Against Uber Defendants Only)**

76.    Plaintiff repleads and incorporates by reference, as if fully set forth again herein, the allegations contained in all paragraphs of this Complaint and incorporates them herein by reference as if separately repled.

77.    Ms. Bernal is, and at all times relevant herein was, a qualified individual with a disability within the meaning of the ADA and the Department of Transportation ("DOT") regulations implementing the ADA, as she has impairments that substantially limit one or more major life activities.

78.    Uber (including its subsidiary Rasier LLC) is a covered entity under the ADA because it is a transportation company—it is "primarily engaged in the business of transporting people" and its "operations affect commerce" under 42 U.S.C. § 12184. Uber has non-delegable duties under the ADA to provide transportation to qualified individuals with disabilities, including Ms. Bernal.

79.    More specifically, Uber (either directly or indirectly through its employee drivers) owns, operates, or leases vehicles providing taxi service and specified public transportation within the meaning of Title III of the ADA and its implementing regulations. Furthermore, Uber operates a "demand responsive system" as that term is defined by the ADA and DOT regulations.

80.    Uber is also a "public accommodation" under the ADA.

81.    Uber's acts and omissions as herein alleged have violated Ms. Bernal's rights under the ADA and its implementing regulations. Uber is both directly and vicariously liable for the many violations of Plaintiff's rights described herein including, *inter alia*:

COMPLAINT

a.  Uber is vicariously liable under agency principles and because it has a nondelegable duty under the ADA for each time its drivers denied Ms. Bernal public transportation services based on her disability;

b.  Uber is vicariously liable under agency principles and because it has a nondelegable duty under the ADA for each time its drivers denied Ms. Bernal the opportunity to use transportation services intended for the general public, when she was capable of using those services;

c.  Uber is vicariously liable under agency principles and because it has a nondelegable duty under the ADA for each time its drivers imposed or applied eligibility criteria that screen out or tend to screen out individuals—like Ms. Bernal—who use service animals as an accommodation for a visual disability from fully enjoying the specified public transportation services provided by Uber, despite the fact that excluding these individuals is unnecessary for the provision of the transportation services being offered;

d.  Uber is directly liable for failing to make reasonable modifications in policies, practices, or procedures, when the modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals—like Ms. Bernal—who use service animals as an accommodation for a visual disability, despite the fact that Uber cannot demonstrate that making the necessary modifications would fundamentally alter the nature of the transportation services it offers;

e.  Uber is directly liable for failing to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals, despite the fact that taking such steps would not fundamentally alter the nature of Uber's services and would furthermore not constitute an undue burden on Uber or its employees. Such steps include but are not limited to properly logging and investigating claims of discrimination by riders like Ms. Bernal, and taking appropriate action, such as permanently terminating drivers from the platform; and

f.  Uber is directly liable failing to ensure that its drivers are "trained to proficiency" to interact with and provide services to blind and visually impaired riders with guide dogs.

82.  Uber is vicariously liable for the intentional discrimination of Defendant Malik Doe who denied Ms. Bernal from fully enjoying the public transportation services provided by Uber because of the presence of her service dog.

14

83.     The acts and omissions of Uber and Malik Doe set forth herein were in violation of Ms. Bernal's rights under the ADA and its implementing regulations. As a result of these acts and omissions, Ms. Bernal has been subjected to repeated and continuing harm.

84.     Plaintiff is entitled to the remedies, procedures, and rights set forth in 42 U.S.C. § 12205.

### B.    VIOLATION OF TEXAS HUMAN RESOURCES CODE
### [Tex. Hum. Res. Code § 121.003]
### (Against All Defendants)

85.     Plaintiff repleads and incorporates by reference, as if fully set forth again herein, the allegations contained in all paragraphs of this Complaint and incorporates them herein as if separately repled.

86.     At all times relevant to this action, Plaintiff was substantially limited in the major life activities of seeing. Accordingly, she is a "person with a disability" as defined under Chapter 121 of the Texas Human Resources Code, § 121.002(4)(F).

87.     Chapter 121 of the THRC ("Chapter 121") prohibits common carriers or other public conveyance or mode of transportation operating within the state from refusing to accept as a passenger a person with a disability because of the person's disability. TEX. HUM. RES. CODE § 121.003(b).

88.     Chapter 121 prohibits assaulting, harassing, interfering with, or injuring in any way, or attempting to assault, harass, interfere with, or injure in any way, an assistance animal. *Id.* § 121.003(j).

89.     Chapter 121 defines "discrimination" as a failure to "make reasonable accommodations in policies, practices, and procedures." *Id.* § 121.003(d)(2).

90.     Chapter 121 provides that any person, firm, association, corporation, organization, or agent of any person who discriminate against a person with a disability in violation of the Chapter is deemed to have deprived a person of his or her civil liberties and is liable for their discrimination.

COMPLAINT

91.    Under Chapter 121, the Uber Defendants are vicariously liable for Defendant Doe's discrimination against Plaintiff.

92.    For the reasons described above, Defendants failed to make reasonable accommodations for Plaintiff to accommodate her disability and her guide dog. In doing so, all Defendants denied Plaintiff access to their services in the same manner that they are provided to non-disabled individuals. Accordingly, Defendants violated Plaintiff's rights pursuant to Chapter 121.

93.    Chapter 121 provides that an individual deprived of her rights under the law may seek a civil remedy in a court of competent jurisdiction, including damages. *Id.* §121.003-121.004.

94.    The acts and omissions of the Uber Defendants and Defendant Malik Doe set forth herein were in violation of Ms. Bernal's rights under the THRC. As a result of these acts and omissions, Ms. Bernal has been subjected to repeated and continuing harm.

## C.    TEXAS UNIFORM DECLARATORY JUDGMENTS ACT
### [Tex. Civ. Prac. & Rem. Code § 37.004]
### (Against All Defendants)

95.    Plaintiff repleads and incorporates by reference, as if fully set forth herein, the allegations contained in all paragraphs of this Complaint and incorporates them herein as if separately repleaded.

96.    Pursuant to Texas Civil Practice and Remedies Code Chapter 37, Plaintiff is entitled to have the Court declare her rights, status, and other legal relations under Texas Human Resources Code Chater 121.

## D.    NEGLIGENT HIRING, SUPERVISION, AND TRAINING
### (Against Uber Defendants Only)

97.    Plaintiff repleads and incorporates by reference, as if fully set forth again herein, the allegations contained in all paragraphs of this Complaint and incorporates them herein as if separately repleaded.

98.    The Uber Defendants were negligent in hiring, supervising, and training their

16

driver, Defendant Malik Doe.

99.    The Uber Defendants negligently hired Doe despite, on information and belief, knowing or when they should have known that Doe was an incompetent and/or dangerous driver.

100.    The Uber Defendants supervised Doe on the date of the incident in question yet failed to prevent Doe from operating the vehicle in an unsafe manner.

101.    The Uber Defendants failed to train Doe for the position they hired him for and failed to train him to safely operate the vehicle.

102.    Each of these acts and omissions, singularly or in combination with others, constituted negligence, and each proximately caused Plaintiff's injuries and damages.

### E.    NEGLIGENCE AND NEGLIGENCE *PER SE*
### (Against Defendant Doe)

103.    Plaintiff repleads and incorporates by reference, as if fully set forth again herein, the allegations contained in all paragraphs of this Complaint and incorporates them herein as if separately repleaded.

104.    On the occasion in question, Defendant Malik Doe operated his vehicle in a negligent manner. He violated the duty he owed to Ms. Bernal to exercise ordinary care in the operation of a motor vehicle in one or more of the following ways:

    a.    Failing to keep a proper lookout as would have been kept by a person exercising ordinary care and prudence under similar circumstances;

    b.    Failing to exercise due care or take proper precautions around a pedestrian (Texas Transportation Code § 552.008);

    c.    Failing to exercise due care or take proper precautions around a blind or visually impaired pedestrian;

    d.    Failing to stop and render aid from a collision resulting in injury (Texas Transportation Code § 550.021);

    e.    Failing to give information following a collision resulting in injury (Texas Transportation Code § 550.023); and

    f.    Failing to drive in a safe and prudent manner.

COMPLAINT

105.    Each of these acts and omissions, singularly or in combination with others, constituted negligence and/or negligence *per se* and each proximately caused Plaintiff's injuries and damages.

## F.  VICARIOUS LIABILITY FOR DRIVER'S TORTS
### (Against Uber Defendants Only)

106.    Plaintiff repleads and incorporates by reference, as if fully set forth again herein, the allegations contained in all paragraphs of this Complaint and incorporates them herein as if separately repled.

107.    Uber is vicariously liable for the torts of its driver through the theories of *respondeat superior*, nondelegable duties, agency, and ostensible agency. Uber's liability for the acts of its driver is not contingent upon the classification of its driver as an employee.

108.    Under the doctrine of *respondeat superior*, Uber is responsible for the torts of its employees committed within the scope of employment. The modern rationale for the theory is that an employer who profits from an enterprise which, through the torts of his employees, causes harm to others should bear the costs of the injury instead of the innocent injured Plaintiff.

109.    Uber profits from transporting vulnerable passengers. Uber encourages disabled passengers to use its services. At the same time, Uber does not take reasonable steps to protect its passengers or warn them that Uber does not adequately train or require Uber Drivers to comply with their obligations under the ADA, THRC, or Texas law.

110.    Uber drivers are employees and agents of Uber. Uber reserves the right to control the activities of Uber drivers. Uber controls the prices charged to customers, controls contact with the customer base, controls the ability of a driver to see where he will be driving before he accepts a ride, and reserves the right to terminate drivers with or without cause, though it rarely does so.

111.    Defendant Doe's negligence occurred while he was acting within the scope of his employment with Uber.

112.    Uber may maintain that its drivers are contractors and not employees. Nevertheless, whether Uber drivers are characterized as contractors, employees, or agents, Uber has a nondelegable duty to transport its passengers safely and in compliance with the ADA and THRC.

113.    The doctrine of nondelegable duty recognizes that for public-policy reasons, certain duties cannot be delegated to a third party. It operates to ensure that when a harm occurs the injured party will be compensated by the party whose activity caused the harm and who may therefore properly be held liable for the acts of his agent, whether the agent was an employee or an independent contractor. The doctrine recognizes that an entity may not delegate its duties to a contractor to evade its own responsibilities. This is especially so when allowing delegation would incentivize the employers to hire incompetent contractors to further the employer's pecuniary interests.

114.    In advertising to passengers, including Plaintiff, that Uber provides them a safe ride to their destinations, and by profiting off disabled riders who use Uber for that very purpose but then are denied rides because of their service dogs, and in Ms. Bernal's case, subsequently injured by the negligence of her driver, Uber has a duty to its passengers that cannot be delegated. To allow Uber to delegate the liability for the negligent acts committed by its drivers to anyone else would encourage Uber to continue to utilize the cheapest, fastest, and most haphazard safety procedures. Uber would be disincentivized from hiring only competent drivers, since the more drivers Uber has, the more money Uber makes.

115.    Further, Uber drivers act as agents of and operate as extensions of Uber. Uber drivers represent Uber's business and further Uber's pecuniary interests.

116.    Uber drivers display the Uber logo when interacting with passengers, and in many cases Uber drivers are the only people with whom Uber's passengers have direct contact. Uber drivers provide the service that Uber claims to provide—transportation.

117.    By allowing Uber drivers to represent Uber's business, Uber creates the impression that its drivers, including the Uber driver at issue here, were Uber's employees and/or agents. Plaintiff reasonably believed that the Uber driver was an employee or agent of Uber, and, relying on this belief, attempted to get in a vehicle with him in exchange for a fee and suffered harm as a result of her contact with the driver.

118.    For these reasons and others, Uber is vicariously liable for the tortious acts of its drivers, regardless of whether Uber's drivers are employees, agents, apparent agents, or contractors of Uber.

119.    As a direct and proximate result of the Uber driver's negligence, Plaintiff suffered physical harm and mental anguish from which she may never fully recover.

120.    As a direct and proximate result of Uber driver's tortious conduct for which Uber is legally liable, Plaintiff has suffered economic and general, non-economic damages.

## VI.    DAMAGES

121.    The Defendants' acts and omissions were each a proximate cause of Plaintiffs' injuries and damages.

122.    As a result of Defendants' discrimination, negligence, and negligence per se, Plaintiff suffered injuries and damages, including the following, for which she seeks recovery:

    a.    Past and future medical expenses;

    b.    Past and future mental anguish;

    c.    Past and future physical pain;

    d.    Past and future disfigurement;

COMPLAINT

e.  Past and future impairment;

f.  Economic damages, including but not limited to costs necessary to evaluate Papita for injury;

g.  Declaratory relief;

h.  Injunctive relief;

i.  Attorneys' fees, including costs, expert fees, and attorneys' fees pursuant to 42 U.S.C. §§ 12118 and 2000a-3 and TEX. CIV. PRAC. & REM. CODE § 37.009;

j.  Pre-judgment and post-judgment interest at the highest rates allowable under the law; and

k.  All other compensatory and/or general damages to which Plaintiff is entitled under state or federal law.

## VII.    JURY DEMAND

123.    Plaintiff respectfully requests a trial by jury.

## VIII.    PRAYER FOR RELIEF

124.    WHEREFORE, Plaintiff prays for judgment and the following specific relief against Defendants:

a.  Issue a declaratory judgment that Defendants' conduct has violated, and continues to violate, the ADA (42 U.S.C. § 12101, *et seq.*) and accompanying regulations and the THRC;

b.  Issue a preliminary and permanent injunction directing the Uber Defendants to: (a) make reasonable modifications in policies, practices, or procedures, when the modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals who use service animals as an accommodation for a visual disability; (b) take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals; and ensure that its drivers are "trained to proficiency" to interact with and provide services to disabled riders with service dogs;

c.  Retain jurisdiction over the Uber Defendants until the Court is satisfied that Defendants' unlawful policies, practices, acts and omissions as complained of here no longer occur, and cannot recur;

21

COMPLAINT

d.    Award compensatory damages to the Plaintiff against all Defendants;

e.    Award to Plaintiff attorneys' fees, litigation expenses, and costs of this proceeding as provided by law;

f.    Award pre- and post-judgment interest at the highest rate allowable under the law; and

g.    Award and grant any other relief that this Court may deem just and proper.

Date: November 26, 2024

Respectfully submitted,

**EDWARDS LAW**
603 W. 17th Street
Austin, TX 78701
Tel.  512-623-7727
Fax.  512-623-7729

By    /s/ Jeff Edwards
JEFF EDWARDS
State Bar No. 24014406
jeff@edwards-law.com
MIKE SINGLEY
State Bar No. 00794642
mike@edwards-law.com
DAVID JAMES
State Bar No. 24092572
david@edwards-law.com
LISA SNEAD
State Bar No. 24062204
lisa@edwards-law.com
PAUL SAMUEL
State Bar No. 24124463
paul@edwards-law.com

**PEIFFER WOLF CARR KANE
CONWAY & WISE**
555 Montgomery St., Suite 820
San Francisco, CA 94111
Tel. 415-766-3544
Fax. 415-840-9435

22

COMPLAINT

By\_\_\_\_\_/s/ Cat Cabalo_____
CAT CABALO (*pro hac vice pending*)
California State Bar No. 248198
ccabalo@peifferwolf.com

**ATTORNEYS FOR PLAINTIFF**